(13 Misc. Rep. 174.)

GLASSHEIM v. NEW YORK ECONOMICAL PRINTING CO.

(Common Pleas of New York City and County, General Term. June 3, 1895.)

1. NEGLIGENCE—DANGEROUS MACHINERY—COMPLIANCE WITH FACTORY LAWS.
    Shafting in a factory, placed 9½ feet above the floor, is "properly guarded" as required by Laws 1892, c. 673, § 8.

**2. Contributory Negligence—Going in Dangerous Place.**
> Plaintiff's intestate, while kalsomining defendant's factory building, where he had been working for three days, fell from a temporary platform against the shafting, which was suspended near the ceiling, and was killed. By using a long brush, instead of a short one, he could have stood on the floor and done his work, thereby avoiding the necessity of being near the shafting. *Held* that intestate was guilty of contributory negligence.

Appeal from trial term.

Action by William Glassheim, as administrator, against the New York Economical Printing Company. From a judgment entered on a verdict in favor of plaintiff, and from an order denying a motion for a new trial on the minutes, defendant appeals. Reversed.

Argued before BOOKSTAVER, BISCHOFF, and PRYOR, JJ.

Henry M. Russell, for appellant.

Edward Wells, Jr., for respondent.

BOOKSTAVER, J. This action was brought against Hugh Nesbitt and the New York Economical Printing Company for alleged negligence, whereby Samuel Glassheim suffered injuries from which he died. From the case it appears that the deceased was at the time of his death, on June 14, 1893, about 28 years old, and had been for several years a painter in the employ of the defendant and Nesbitt. The defendant company was a domestic corporation engaged in the printing business at 24 and 26 Vesey street, in this city, occupying the entire building; as tenants of Robert Hoe, who furnished the power for the various shaftings and presses owned by the company. The main belt ran from the engine to the fourth floor, and the power was thence belted down to the third floor by another belt. On the third floor this shafting ran nearly the whole length of the building from north to south, and had on it four cone pulleys, or a series of wheels of different sizes combined in one, making a cone in shape. The pulleys were held in place by collars, which are round bands of iron fastened to the shaft by means of set screws. The heads of these screws necessarily project beyond the collar. There was no box or fence around the shafting, and no clutch to throw off the power, and the belts were shifted by means of sticks called "belt shafts." But the ceiling was 11 feet high, and the shafting was suspended by hangers with a drop of about 18 inches from the ceiling, and about $9\frac{1}{2}$ feet from the floor. Shortly before the accident the defendant Nesbitt had contracted with Hoe, the owner, to kalsomine the walls and ceilings of the premises in question; and the deceased, with another workman, had been engaged on that work for about three days. On the 14th of June, 1893, he, together with a fellow workman, had been nearly all day on the third floor, kalsomining, and a little after 4 o'clock he was standing, according to plaintiff's witness, on a board stretched between two ladders, and, according to defendant's witness, on the slippery and inclined free board of a printing press, when he slipped, and his clothing was caught in a set screw which projected about two inches from one of the collars on the

shaft, and he was rapidly whirled about the shafting, in the narrow space between it, the ceiling, and the wall.    Before the machinery could be stopped, he was so injured that he died soon thereafter. The plaintiff was duly appointed administrator of the deceased, and thereafter commenced this action.    At the close of the plaintiff's case the complaint was dismissed as to the defendant Nesbitt, and the trial continued against the defendant company, resulting in a verdict in favor of the plaintiff for the sum of $2,500.    The defendant company moved to dismiss the complaint, both at the close of plaintiff's case and, also, when all the testimony was in, on the grounds that no negligence had been shown on the part of the defendant company, and it had not been shown that the deceased was not guilty of contributory negligence; also that the dangers to be apprehended were obvious to the deceased, and he assumed the risk of the work.

First, as to defendant's negligence:    It is conceded that it is the duty of the master to furnish reasonably safe machinery and appliances, and a reasonably safe place in which to work; but the master is not bound to furnish or use the latest and most approved appliances.    Burke v. Witherbee, 98 N. Y. 562;  Carlson v. Bridge Co., 132 N. Y. 273, 30 N. E. 750;  Kern v. Refining Co., 125 N. Y. 50, 25 N. E. 1071;  Stringham v. Hilton, 111 N. Y. 188, 18 N. E. 870.    The plant had been installed by Van Allen & Boughton,—a firm who had made that kind of work their particular business, and were among the largest and best known firms in the trade.    The shafting and appliances were of a kind in common use in such places, and were considered in the trade sufficient for the purposes for which they were constructed.    It had been in use for a number of years without accident.    No expert was called on behalf of the plaintiff, but Mr. Entwhistle, defendant's expert, testified that he never knew of any accident to happen from the use of a set screw of the kind in use on this shafting, and that he knew of no appliance in general use for obviating the danger from such screws.    The shafting was in good repair and perfect order, as constructed.    It had been used as it was at the time of the accident, save ordinary repairs, which did not change the structural shape or condition, for a number of years.    Under such circumstances, it was held error to submit the question of negligence to the jury in Riordan v. Steamship Co. (Com. Pl. N. Y.) 11 N. Y. Supp. 57.    No machinery or shafting is constructed in such a way that it cannot be made safer; but it is a well-settled rule of law that, in determining the question as to whether or not the use of a particular machine was negligence, the question must be viewed from the standpoint of what was known at the time of the occurrence, and not from what was discovered after the accident took place.    Dougan v. Transportation Co., 56 N. Y. 1;  Loftus v. Ferry Co., 84 N. Y. 455.    The accident happened, not in the use of an improper structure, but in the misuse of one that was entirely safe.    The shafting had been in continuous daily use for five years before this accident, without injury or harm to any one.    The defendant had no reason to suppose that the shafting was in any way dangerous, defective, or in-

adequate for the purpose for which it was intended. The owner of premises occupied for business purposes is only required to use reasonable care and prudence for keeping the property in such condition that those who go there shall not unnecessarily be exposed to danger. Flynn v. Railroad Co., 142 N. Y. 439, 37 N. E. 514; Hart v. Grennell, 122 N. Y. 374, 25 N. E. 354; Larkin v. O'Neill, 119 N. Y. 225, 23 N. E. 563.

But respondent contends that notwithstanding these facts the defendant was guilty of negligence, in not complying with chapter 673, § 8, Laws 1892, known as the "Factory Act," which provides that "all vats, pans, saws, planers, cogs, gearing, belting, shafting, set-screws and machinery of every description therein shall be properly guarded." The main belt was boxed to a height which prevented anybody from being caught in it, and it was testified that it would be impossible to box or inclose the shafting or belting, as there was continual need of shifting and changing the belts upon the pulleys; and that this must have been the case needs no argument. If it had been boxed or guarded so as to have prevented absolutely any accident, it would have been entirely useless for the purpose of communicating power to the machinery. The law never requires an impossibility to be performed. Accordingly, it was said in Cobb v. Welcher, 75 Hun, 283, 26 N. Y. Supp. 1068, "We do not understand the statute [the factory act] to make the factory man the insurer of the safety of his employés, or that it requires him to guard against extraordinary accidents which careful and prudent men could not foresee, or anticipate as liable to occur." This shafting was suspended from the ceiling at such a height as to render it impossible, under ordinary circumstances, that an accident like this could have occurred. The court will take judicial notice that men are not nine feet high, and therefore, without climbing up to it, there was no possibility of any danger either from the shafting or the set screw. Surely, under the circumstances, with this shafting that height above the floor, the defendant had, as fully as possible, properly guarded this portion of the machinery; for it must be assumed that the act in question was only intended to guard against such accidents as were likely to happen in the ordinary and common use of the place where the machinery was. Besides all this, there had been a visit of the factory inspector to the premises in question the month before the accident, and certain changes had been made, but none touching the machinery or shafting.

Respondent also contends that the defendant was guilty of negligence in not providing a clutch, which is a device to throw the machinery out of gear. The main purpose of this device is to throw off the power when different parties are users of it upon different floors of the same building, so that none of it may be wasted; but as the defendant occupied the entire building, and controlled its own power, there was no reason for such a clutch. But, even if there had been one, it could not possibly have prevented the accident, as the shaft was making from 125 to 150 revolutions per minute, and it would have taken several seconds before it could have

been stopped, and would therefore have made many revolutions in that time; so that the deceased would have been as certainly mortally injured, had there been a clutch, as he was without one.

The respondent also contends that it was negligence on the part of the defendant to have used the collar with a set screw projecting above it, and in the position in which it was found after the accident; but in regard to this the learned judge who tried the case very properly charged the jury:

"I do not find in the case any evidence that prior to the time of this accident anybody had seen it [that is, the set screw] in any place away from the pulley to which the machinist said it was originally intended to be attached. That being the case, it seems to me that we should dismiss from our consideration any question of negligence growing out of the position of the collar; for, so far as we know now, it may have been displaced by the accident itself, which must have been of an exceedingly violent character."

Besides all this, the defendant's foreman had asked the deceased if he desired the belts thrown off, and the machinery stopped, the day of the accident; and he said he only wanted the cross belts thrown off, and the main belt left running, as it gave him more room to do the whitewashing. Even had the defendant company been negligent in some respects, yet, had this offer of its foreman been accepted, it needs no argument to show that the accident could not have happened. We therefore think the appellant was guilty of no negligence causing the accident. On the other hand, we think it clearly appears that the deceased himself was guilty of negligence. The shafting was revolving at a rapid rate. The deceased had been working around it nearly three days, and must have known it was negligent and careless for him to work around it while in motion. He should have accepted the offer of defendant's foreman to stop the machinery, but he refused to have it stopped; preferring to have it kept running, as that gave him more room to do his whitewashing. This only rendered his work easier, and was for his own convenience, and he alone should suffer the consequences. He was warned by his employer not to work around the machinery, and not to go where it was dangerous. He could have used a brush with a long handle, and stood on the floor, and so avoided coming anywhere near the shafting; but he chose, instead, to use a short brush, thus being obliged to stand close to his work. This, again, was for his own convenience, and was manifest negligence on his part. There is some contradiction in the evidence as to where the deceased stood at the time of the accident, and, if he stood where the witness Ulmer swears he did,—upon the feed board of one of the printing presses, which was of smooth, highly-polished wood, inclined at an angle,—that was manifestly a dangerous position. This particular matter, however, will be further considered upon another branch of the case. We therefore think that the plaintiff not only failed to show the absence of negligence on the part of the deceased, which must be affirmatively shown (Bond v. Smith, 113 N. Y. 378, 21 N. E. 128; Weston v. City of Troy, 139 N. Y. 281, 34 N. E. 780), but that the case also clearly establishes the negligence of the deceased, directly causing the accident. Having arrived at this conclusion, it is

only necessary to suggest, and not to argue, that if there was any danger it was as obvious to the deceased as to the defendant, and that he assumed the risk of his danger. Williams v. Railroad Co., 116 N. Y. 628, 22 N. E. 1117; Wise v. Ackerman (Md.) 25 Atl. 424.

But, even if we are mistaken as to the law in regard to defendant's negligence and the deceased's contributory negligence, there should still be a new trial in this case, as the verdict was clearly against the weight of evidence, and should have been set aside. After the verdict, a motion was made to set it aside on this ground. We have repeatedly held that it is not only our duty to review the evidence on such a question, but also to set aside the verdict, if, in our opinion, justice requires it. The case of the plaintiff rests almost wholly upon the testimony of Max Lang, and his evidence seems to us to be of such a character as to require the closest scrutiny. He is a self-confessed spy upon the superintendent. His testimony is contradictory, and is flatly controverted by two or three other witnesses on the several different points,—witnesses who were men of long-continued service in their positions, and good character; notably, the witness Ulmer, who was his fellow workman, not in the employ of the defendants, and apparently entirely trustworthy, who swears the deceased was standing upon the feed board of the press, right alongside of him, while Lang testifies that he was standing upon boards placed between ladders. For these reasons, we think the judgment should be reversed, and a new trial ordered, with costs to the appellant, to be paid before such trial. All concur.